**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

MARGARET E. GIBBS, individually and as personal representative of the estate of HARRY G. GIBBS, deceased,

    Plaintiff,

v.

Case No. 6:13-cv-1043-Orl-37KRS

THE CITY OF WINTER GARDEN, a municipal corporation; and JAMES EDWARD CAPELETTI, in his individual capacity,

    Defendants.

**ORDER**

This matter is before the Court on the following:

1. Defendant, City of Winter Garden's Revised Motion for Final Summary Judgment and Incorporated Memorandum of Law (Doc. 78), filed April 18, 2014;

2. Plaintiff's Response to Defendant, City of Winter Garden's Revised Motion for Final Summary Judgment and Incorporated Memorandum of Law (Doc. 84), filed May 1, 2014;

3. City of Winter Garden's Reply to Plaintiff's Response to Defendant's Revised Motion for Final Summary Judgment (Doc. 92), filed May 14, 2014;

4. Defendant, James Edward Capeletti's Revised Motion for Final Summary Judgment and Incorporated Memorandum of Law (Doc. 79), filed April 18, 2014;

5. Plaintiff's Response to Defendant, James Edward Capeletti's Revised Motion for Final Summary Judgment and Incorporated Memorandum of Law (Doc. 85), filed May 1, 2014; and

6. James Edward Capeletti's Reply to Plaintiff's Response to Defendant's Revised Motion for Final Summary Judgment (Doc. 93), filed May 14, 2014;

7. Defendants' Motion to Exclude Plaintiffs' Expert Witness (Doc. 70), filed April 11, 2014; and

8. Plaintiff's Response to Defendants' Motion to Exclude Plaintiff's Expert Witness and Incorporated Memorandum of Law (Doc. 80), filed April 25, 2014.

## BACKGROUND

Harry G. Gibbs ("Gibbs") was shot to death in his home by Defendant James Edward Capeletti ("Capeletti"), who was a sergeant on duty with Defendant City of Winter Garden's police department ("City"). (Doc. 53.) Construed in the light most favorable to Plaintiff (Gibbs wife) the facts are as follows.

On the evening of June 13, 2011, Capeletti was a supervisor on patrol when he heard a police radio transmission that Plaintiff had called 9-1-1 to report that: Gibbs was coming off of pain pills; he was drunk;[1] he had attempted to smother Plaintiff; he was in their residence with a shotgun; and Plaintiff was at her neighbor's residence. (Doc. 61-1,

---

[1] Gibbs' autopsy confirms that he was intoxicated. (*See* Doc. 67-2; *see also* Doc. 85, p. 8.) Gibbs' blood ethanol level was about three times the legal limit for operating a motor vehicle on public roadways in Florida. (Doc. 67-1, pp. 15–16, 18; Doc. 67-2, pp. 12–14.) Gibbs' blood also tested positive for diphenhydramine, eszopiclone (a sedative), ibuprofen, and caffeine. (Doc. 67-1, pp. 14–15; Doc. 67-2, pp. 12–13.)

pp. 15–16, 21, 35; *see also* Doc. 59-1, pp. 52–56; Doc. 62-1, pp. 55–56; Doc. 63-1, pp. 9–10; Doc. 64-1, pp. 13, 15.) Uniformed City police officers James Christopher Avila and Joshua Graham both responded over the police radio that they were en route to the Gibbs residence.[2] (Doc. 63-1, pp. 8–9.) Capeletti responded later when Graham and Avila called for "emergency traffic" on the police radio,[3] advising that there was a shotgun in the residence, Gibbs was intoxicated, and he was not showing the left side of his body or otherwise complying with officer commands. (Doc. 61-1, pp. 24–25, 27.) Two other City police officers, Arron Jenkins and Paula Fambrough, also went to the Gibbs residence based on subsequent radio traffic. (Doc. 62-1, pp. 18–19; Doc. 68-1, pp. 21–22.)

      Capeletti parked at an intersection near the Gibbs residence. (Doc. 64-1, p. 32.) Approaching on foot, he observed Avila standing by a tree near the residence and Graham standing near a home to the left of the residence. (*Id.* at 96–97.) Capeletti heard Avila attempting to communicate with Gibbs, who he understood was alone in the residence. (*Id.* at 29, 32, 45.) Capeletti stood by Graham's patrol vehicle, which was parked to the left of the residence. (*Id.* at 32–35.) He was approximately ninety feet from the front door (*see* Doc. 62-1, p. 52; Doc. 63-1, pp. 41, 48; Doc. 64-1, p. 61), and he observed that the solid interior door and the glass storm door were closed. (Doc. 61-1, pp. 32–35; *see also* Doc. 84-3, p. 2.)

---

[2] When Avila and Graham arrived, Plaintiff did not appear to be physically harmed, but she reiterated to them that Gibbs was alone, he had a shotgun, and he had tried to smother her. (Doc. 59-1, pp. 46–47, 88; Doc. 64-1, pp. 16–18.)

[3] Emergency traffic means that the officers "get a clear channel" on the radio, "no one else talks on the radio besides them or the officers involved with the situation they are dealing with." (Doc. 65-1, pp. 12–13.)

Because the doors were closed and Gibbs was not talking to the officers when Capeletti arrived, Capeletti tried to obtain Gibbs' phone number to persuade him to exit the residence so the officers could conduct their investigation. (Doc. 59-1, pp. 35–37.) While Capeletti attempted to obtain Gibbs' phone number, Gibbs opened the interior door and stood at the entrance behind the closed glass door. (*Id.* at 43–44.) The area was dark (*id.* at 49; Doc. 68-1, p. 23), but lights were on in the residence (Doc. 59-1, p. 46), and Capeletti shined his flashlight at Gibbs to get a better view (*id.* at 49). Capeletti could see the right side of Gibbs' body from the top of his head to his knee, but he could not see the left side of Gibbs' body.[4] (*Id.* at 66–67.) Capeletti did not know where the other officers were located when the door opened (*id.* at 56, 59), and he testified that it was a stressful situation.[5] (*Id.* at 52–53.)

Capeletti instructed Gibbs to show his left hand. (*Id.* at 67–68.) When Gibbs complied, Capeletti saw that Gibbs was holding a shotgun and pointing it downward. (*Id.* at 68.) Upon seeing the shotgun, Capeletti went from a standing position to a prone position on the ground behind Graham's patrol car, and he ordered Gibbs to drop the gun. (Doc. 61-1, pp. 71–72.) Rather than comply, Gibbs moved the gun so that he was holding it "up in the air" with one arm at the bottom of the grip. (*Id.* at 72–73.) Capeletti gave additional commands to Gibbs to drop the gun, and the next thing he saw was:

> [T]he gun is coming down lower and it's, like, caught with his left hand. Now, he still [has] the—it just comes down and it's like, right hand still

---

[4] Gibbs was 6'1" and weighed 200 pounds. (Doc. 59-1, p. 37.)

[5] The persons present testified consistently that the situation was stressful. Gibbs' conduct made Avila "nervous" and scared (Doc. 64-1, pp. 28–29, 47, 63), and Avila, Jenkins, and Fambrough unholstered their firearms upon arriving at the Gibbs residence. Avila and Jenkins did so because of the report of Gibbs' violence toward Plaintiff and his access to a shotgun. (Doc. 64-1, pp. 23–24; Doc. 62-1, pp. 25, 62.) Plaintiff's neighbor was frightened (Doc. 60-1, pp. 25–26, 28–30, 43), and even Plaintiff was "concerned for the police officers' safety." (Doc. 59-1, pp. 60, 83–84, 87.)

4

> back by, you know, where you hold the shotgun and the—and the trigger housing is at. So now, you're—you're resting the forearm part of the gun in your left . . . . [T]he gun is being held the—the typical way to hold a shotgun rifle at waist level, now pointing outside the door towards me [through the closed storm door].

(*Id.* at 74–76 ("From where I'm lying at, I see the direct line of sight and I see the gun pointing at my direction.").) Then:

> So addressing the threat and the individual not complying, and like I said, seeing the threat, a guy pointing a gun, now it's being pointed at me, i.e., in my direction. I don't know where the other officers are at, so I don't know if their lives are in danger or in jeopardy. So I got to protect myself and my other officers and not complying and I addressed the threat of immediate danger and that's when I fired the shots. . . .
>
> Immediately after [I] shot, I stayed in [the prone] position, of course to see if the threat is still there. And then I take it that after shots were fired, the individual retreated back into the residence or stepped back inside the—the doorway where we couldn't see him or—he just was not in the doorway anymore.

(*Id.* at 77–78.)

Capeletti fired five .40 caliber shells at Gibbs. (*Id.* at 78, 93; *see also* Doc. 62-1, p. 52; Doc. 64-1, p. 69.) Two of the five shots struck Gibbs in his left flank and scalp, and either shot may have caused Gibbs' death. (Doc. 67-1, p. 20.) Based on the entrance wounds and the path of the bullets, the left side of Gibbs' body had to have been toward Capeletti when he fired. (Doc. 67-1, p. 29; Doc. 67-2, p. 9 (noting that the direction of both wounds was "left to right, back to front, and upward").)

Of the five officers who responded to the Gibbs residence, only Capeletti testified that he saw Gibbs pointing the shotgun toward Capeletti when he shot Gibbs. Jenkins testified that he never saw the shotgun because he was attempting to stay out of Gibbs' view (Doc. 62-1, pp. 44–45, 51–53), and Fambrough was behind the Gibbs residence when shots were fired. (Doc. 68-1, p. 13.) Graham was standing behind his car for

5

cover (Doc. 63-1, p. 48), and he was not looking at Gibbs when Capeletti fired. (*Id.* at 55.) Avila also testified that he was not "in a position to see the front door." (Doc. 64-1, pp. 67–69, 71.) Finally, Plaintiff could not see or hear Gibbs during his interactions with the police. (Doc. 59-1, pp. 83–85.)

The gunfire and the moments surrounding it were recorded from Avila's dashboard camera; however, the audio and visual quality of the recording is very poor—the images are dark and there is no view of Gibbs or the front door. (Doc. 77.) Rather, the recording shows only Graham's car, the street, a portion of the front of the Gibbs residence, and unidentifiable silhouettes of the officers moving around. (*Id.*) Further, given the poor quality of the audio and interfering static, not all that was said by Gibbs and the officers is audible on the recording. (*Id.*)

What can be determined from the recording is that five shots were fired over two seconds starting at the 9:33 mark. (*Id.*) From the 7:44 second mark until the 9:12 mark, officers instruct Gibbs to drop the gun at least fourteen times. (*Id.*) Further, Capeletti says watch out for "cross-fire" at the 8:48 mark—forty-five seconds before Capeletti shoots. (*Id.*) Twenty-nine seconds after the cross-fire warning, Avila instructed Gibbs to step out and put his hands up. (*Id.*) At approximately the same time—at the 9:19 mark—the flashlight illumination appears on the ground in front of Graham's car. At the 9:32 mark, the illumination disappears then quickly flashes above Graham's car. (*Id.*) Shots ring out a second later—twenty-one seconds after the last audible instruction to drop the gun is heard on the recording—and within a second of the instruction to Gibbs to put his hands up when he comes out. (*Id.*)

In the operative complaint,[6] Plaintiff asserts several state law claims and the following 42 U.S.C. § 1983 claims against the City and Capeletti: unlawful seizure and deprivation of the right to possess a firearm against Capeletti; and unlawful seizure and excessive force against the City based on a lack of proper policy and based on Policy Number 85-31. (Doc. 53.) Capeletti asserted the defense of qualified immunity to Plaintiff's federal claims. (Doc. 55.) Defendants moved for summary judgment (Docs. 78, 79) and to exclude Plaintiff's expert witness. (Doc. 70.) Plaintiff opposed all motions (Docs. 80, 84, 85), and Defendants replied. (Docs. 92, 93.) The Court held a hearing on the motions on June 20, 2014. (Doc. 89.) The motions are now ripe for adjudication.

## STANDARDS

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Materiality of the facts depends on the substantive law applicable to the case. *See id.*

To defeat a motion for summary judgment, the non-moving party must "present affirmative evidence to show that a genuine issue of material fact exists." *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006); *see also McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) ("Any alleged dispute of fact . . . must be material

---

[6] After removal of this action from the Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida (Doc. 1), Defendants filed several motions to dismiss. (Docs. 13, 14, 28, 29, 48, 49.) The Court granted the motions in part and denied them in part. (*See* Doc. 52.) Plaintiff then filed her Third Amended Complaint (Doc. 53), which is the operative pleading.

. . . and supported by the record."). The Court must view the evidence and all reasonable inferences drawn from the evidence in the light most favorable to the non-movant, but it may disregard assertions of fact that are "blatantly contradicted" by record evidence. *See Scott v. Harris*, 550 U.S. 372, 380 (2007); *see also Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014); *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1247--48 (11th Cir. 2013) (noting that courts must credit the non-movant's version of the facts "if there is any evidence to support it").

## DISCUSSION

**I.    Capeletti**

In her 42 U.S.C. § 1983 claims against Capeletti, Plaintiff contends that Capeletti's shooting of Gibbs was an unlawful use of force in violation of Gibbs' Fourth Amendment rights (Count VII) and also violated Gibbs' Second Amendment rights (Count VIII). (Doc. 53; *See also* Doc. 85, p. 19.) To establish a cause of action under § 1983, a plaintiff must prove that the defendant, while acting under color of state law, deprived him of rights protected by the U.S. Constitution or a federal statute. *See West v. Atkins*, 487 U.S. 42, 49–50 (1988). Capeletti now seeks summary judgment on his qualified immunity defense to Plaintiff's § 1983 claims. (Doc. 79.)

"The defense of qualified immunity completely protects government officials performing discretionary functions from suit in their individual capacities unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." *Gonzalez v. Reno*, 325 F.3d 1228, 1233 (11th Cir. 2003); *see Depalis-Lachaud v. Noel*, 505 F. App'x 864, 867 (11th Cir. 2013) (noting that "all but the plainly incompetent or one who is knowingly violating the federal law" are afforded qualified immunity). To prevail on his defense, Capeletti must

establish that "he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). Plaintiff does not dispute that Capeletti has met this burden; thus, the Court must determine whether Capeletti breached a constitutional right of Gibbs' that "was clearly established" on June 13, 2011.[7] *See Harper v. Davis*, No. 13-13190, 2014 WL 3377613, at *4 (11th Cir. July 11, 2014); *see also Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) ("Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate.").

The question of whether a right was "clearly established" focuses on whether the "state of the law" provided the officer with "fair warning that [his] alleged treatment [of the plaintiff] was unconstitutional." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). The "state of the law" is discerned from either:

> (1) earlier case law from the Supreme Court, [the Eleventh Circuit], or the highest court of the pertinent state that is materially similar to the current case and therefore provided clear notice of the violation or (2) general rules of law from a federal constitutional or statutory provision or earlier case law that applied with 'obvious clarity' to the circumstances, establishing the unlawfulness of the [d]efendant's conduct.

*Long v. Slaton*, 508 F.3d 576, 584 (11th Cir. 2007); *see Anderson v. Creighton*, 483 U.S. 635, 640 (1987) ("[T]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.").

---

[7] In resolving a qualified immunity defense at the summary judgment stage, it is important for the court to draw all "inferences in favor of the nonmovant." *Tolan*, 134 S. Ct. at 1866. Courts must be cautious not to "define a case's 'context' in a manner that imports genuinely disputed factual propositions." *Id*; *see also Robinson v. Arrugueta*, 415 F.3d 1252, 1257 (11th Cir. 2005) ("When conducting a qualified immunity analysis, district courts must take the facts in the light most favorable to the party asserting the injury."); *cf. Troupe v. Sarasota Cnty.*, 419 F.3d 1160, 1168 (11th Cir. 2005).

### A.     Fourth Amendment Claim

The Fourth Amendment protects the "right of people to be secure in their persons . . . against unreasonable seizure." *See* U.S. Const. amend. IV; *see also Tennessee v. Garner*, 471 U.S. 1, 7 (1985). Claims "that law-enforcement officers used excessive force [including deadly force] to effect a seizure [are] governed by the Fourth Amendment's reasonableness standard." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2020 (2014). It is not constitutionally unreasonable for an officer to use deadly force against a suspect who poses "an imminent threat of danger to a police officer or others," *Clark v. City of Atlanta*, 544 F. App'x 848, 855–56 (11th Cir. 2013); however, there is no "'magical on/off switch' to determine when an officer is justified in using . . . deadly force." *Garczynski v. Bradshaw*, 573 F.3d 1158, 1166 (11th Cir. 2009) (quoting *Scott*, 550 U.S. at 382). Rather, the objective reasonableness of any force used depends on a "deeply factual" analysis. *See Harper*, 2014 WL 3377613, at *4; *see also Graham v. Connor*, 490 U.S. 386, 396 (1989).

Courts must approach the analysis "from the perspective 'of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Plumhoff*, 134 S. Ct. at 2020 (quoting *Graham*, 490 U.S. at 396). Capeletti is "entitled to qualified immunity 'if an objectively reasonable officer in the same situation could have believed the use of force was not excessive.'" *Bodden v. Bodden*, 510 F. App'x 850, 852 (11th Cir. 2013) (quoting *Brown v. City of Huntsville*, 608 F.3d 724, 738 (11th Cir. 2010)); *see also Priester v. City of Rivera Beach*, 208 F.3d 919, 926 (11th Cir. 2000) (holding that qualified immunity is defeated if the defendant's conduct was "so far beyond the hazy border between excessive and acceptable force that [he] had to know he was violating the Constitution"). Non-exclusive factors pertinent to the inquiry include: (1) "the severity of

10

the crime at issue[;] (2) whether the suspect poses an immediate threat to the safety of the officers or others . . . [;] (3) whether he is actively resisting arrest or attempting to evade arrest by flight," *Graham*, 490 U.S. at 396; and (4) whether the officer had "given some warning about the use of deadly force, if feasible," *Morton v. Kirkwood*, 707 F.3d 1276, 1281 (11th Cir. 2013). *See Penley v. Eslinger*, 605 F.3d 843, 849–50 (11th Cir. 2010) (cautioning that the *Graham* factors must not be mechanically applied); *see also Vaughan v. Cox*, 343 F.3d 1323, 1329–30 (11th Cir. 2003).

As to the first factor, Gibbs' reported conduct before and after the officers arrived at his residence were "undoubtedly serious crimes." *See Penley*, 605 F.3d at 851 (noting that threatening lives, bringing a toy firearm to school, and refusing to comply with officer demands were "undoubtedly serious crimes" weighing in favor of the reasonableness of an officer's use of deadly force). Thus, the first *Graham* factor weighs against Plaintiff's claim.

The second factor also weighs against Plaintiff's claim if the Court accepts Capeletti's testimony that he shot Gibbs while Gibbs was standing in his doorway with a shotgun pointed toward Capeletti after repeated failures to comply with directives from the officers. *See Jean–Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010) (holding that excessive force was reasonable where officer saw suspect holding a gun standing eight to ten feet away from him, and officer fired fourteen times at the suspect); *Garczynski*, 573 F.3d at 1167–68 (holding that officers' use of deadly force was reasonable where suspect refused to obey officers' commands and instead pointed a gun at the officers); *see also Clark*, 544 F. App'x at 856.

Plaintiff contends that questions of fact exist concerning the second *Graham* factor because Capeletti's testimony "is inconsistent with the forensic evidence"

11

(Doc. 85, p. 11), and "common sense and the forensic evidence" support her position that when Capeletti shot Gibbs, Gibbs "was not aiming the shotgun at Capeletti and [was] not facing Capeletti" (*id.* at 14). To support her contention that Gibbs was not pointing the shotgun at Capeletti, Plaintiff points to a photograph from the Gibbs residence that shows the shotgun laying on the floor alongside Gibbs' deceased body with the stock of the gun toward his shoulder and the muzzle toward his shoeless feet. (Doc. 85-1, p. 3.) Plaintiff contends that the photograph shows that the shotgun was open or breached and that a breached shotgun could not be handled by Gibbs in the manner described by Capeleletti. (Doc. 85, pp. 8, 15.) Plaintiff has offered no firearms expert or other evidence to support her contentions, and the Court does not find her contentions and the inferences drawn therefrom to be supported by the photograph. (*See* Doc. 85-1, p. 3.) To the contrary, the proximity of the shotgun to Gibbs' deceased body and the direction of the muzzle are consistent with Capeletti's testimony. (*See id.*)

Plaintiff also points to the testimony of the medical examiner to support her argument that Gibbs could not have posed an immediate threat to the safety of Capeletti because "Gibbs' head and body were not facing Capeletti when Capeletti shot and killed him." (Doc. 85, pp. 11–13.) Although the Court agrees that the left side of Gibbs' body had to have been facing Capeletti when he fired (*see supra* p. 5), the Court disagrees that Capeletti could not have perceived that Gibbs posed an immediate threat with his body so turned. The threat was not from the position of Gibbs' body, but from his handling of the shotgun and from his decision to point it toward Capeletti after the officers repeatedly instructed Gibbs to put the shotgun down. *See Bodden*, 510 F. App'x at 852 (affirming order granting officer's motion for summary judgment where officer used deadly force in the mistaken belief that small bag of marijuana in suspect's hand

was a gun); *see also Penley*, 605 F.3d at 851 (holding that a teenager posed a grave danger to officers when he pointed a fake gun at officers and refused to comply with officer commands to drop the weapon). Accordingly, the Court does not find that the forensic evidence creates an issue of fact that is material to the reasonableness of Capeletti's actions.

Plaintiff next points to the recording, which she contends shows that when Avila made his final statements to Gibbs, "his tone and body language do not indicate that he is in fear for his life or the life of another officer." (Doc. 85, p. 15.) Plaintiff further contends that "for Capeletti's testimony to be true, a jury would need to believe that Avila never looked at the front door during his final conversation with Mr. Gibbs (which lasted at least twenty-two seconds)." (*Id.*) After a careful review of the recording and Avila's testimony, the Court rejects Plaintiff's contentions. Avila's seeming ability to maintain a calm voice while instructing Gibbs to cooperate does not lead to the inferences that he could see Gibbs or that he was not in fear—particularly when Avila testified to the contrary on both points.[8] (*See supra* note 5; *see also* Doc. 64-1, p. 47 (stating that he felt "a threat"); *id.* at 63 (testifying that he still did not feel safe when he retreated to Graham's patrol car); *id.* at 67–69 (testifying that he was not "in a position to see the front door").) Further, the quality of the recording is so poor that the Court cannot even identify the figures seen—let alone determine whether any particular person had a view of the front door. (*See supra* p. 6.) Accordingly, the Court does not find that Avila's statements or actions on the recording create a material question of fact that Gibbs "was not aiming the shotgun at Capeletti and [was] not facing Capeletti"

---

[8] Indeed, Avila testified that the only reason that he did not shoot Gibbs earlier when Gibbs pointed the shotgun at him was that he "didn't want to get engaged in that close of a gun battle when [Gibbs] had a much more powerful rifle." (Doc. 64-1, p. 70.)

when he shot Gibbs. (*See* Doc. 85, p. 14.)

In short, none of the evidence identified by Plaintiff is sufficient to overcome Capeletti's description of Gibbs as posing an immediate threat of serious harm. Thus, the Court concludes that the second *Graham* factor also weighs against Plaintiff's claim. The third *Graham* factor is neutral or weighs slightly in Plaintiff's favor because Gibbs was contained in his home and was not trying to escape.

As to the fourth factor, Plaintiff argues that Capeletti's use of force was unreasonable because the officers did not instruct Gibbs to put the shotgun down during the twenty-two seconds preceding Capeletti's shots, and the officers never warned Gibbs that they "will shoot" if he did not put the shotgun down. (Doc. 85, pp. 15–16.) The Court rejects Plaintiff's argument. The law does not require that officers issue an ultimatum—yelling "drop the gun" is an adequate warning. *See Pace v. Capobianco*, 283 F.3d 1275, 1282 (11th Cir. 2002) (finding no constitutional deprivation where officers yelled "get out of the car" before one of them fatally shot the suspect); *see also Oakes v. Anderson*, 494 F. App'x 35, 39 (11th Cir. 2013);[9] *Southerland v. Carey*, No. 3:11-cv-1193, 2013 WL 1912716, at *5, n. 9 (M.D. Fla. May 9, 2013) (holding that the content, number and frequency of warnings put the suspect "on constructive notice

---

[9] In *Oakes*, the Eleventh Circuit affirmed an order granting the defendants' motions for summary judgment where the officers fatally shot an innocent but "emotionally distraught man" who had access to a gun, had threatened suicide, and who refused officer requests that he step out of his vehicle. 494 F. App'x at 39. For approximately thirty seconds before firing their weapons, the officers shouted for the deceased "to show his hands, but he ignored their repeated commands." *Id.* The *Oakes* court held that it was "objectively reasonable for [an officer] to yell 'gun, gun, gun' as a quick warning to the other officers that the decedent's hands had disappeared into the hold between the seat and the console." *Id.* at 40 (rejecting argument that summary judgment should have been denied due to "tactical mistakes that escalated the situation and ultimately resulted" in the shooting). *Oakes* is similar to the instant case, and it confirms that the warnings provided to Gibbs were sufficient.

that [the officer] might use deadly force if he did not cooperate"). Here, Gibbs was confronted by uniformed law enforcement officers who had instructed him to drop his shotgun at least fourteen times and who discussed the danger of crossfire outside his home in the moments before shots were fired. (*See supra* p. 6.) Under these circumstances, the Court finds that Gibbs received sufficient warnings from the officers before shots were fired.

In summary, Capeletti has met his initial burden to show no genuine dispute of fact that "an objectively reasonable officer in the same situation" that Capeletti faced "could have believed the use of force was" reasonable. *See Bodden*, 510 F. App'x at 852. In the stressful situation presented on the evening of June 13, 2011, such a belief would be justified because: (1) the officers were at the Gibbs residence in lawful response to Plaintiff's 9-1-1 call[10]; (2) Capeletti was faced with an intoxicated Gibbs who had repeatedly refused to comply with instructions from the officers to put his shotgun down; and (3) Gibbs had lowered the shotgun to a position that would permit him to fire on the officers. (*See supra* pp. 2–6.) Plaintiff has not presented affirmative evidence to

---

[10] All of the officers testified that they were at the Gibbs residence as part of an investigation prompted by Plaintiff's 9-1-1 call. (*See* Doc. 62-1, p. 53 (stating that the officers were called to the residence "for a criminal complaint"); Doc. 63-1, p. 28 (stating that the officers were investigating a potential domestic battery); Doc. 64-1, pp. 21–22, 47–48 (stating that officers were there to investigate, but there was probable cause to arrest Gibbs for his assault of Plaintiff); Doc. 68-1, p. 33 (stating that the officers were "investigating a disturbance").) Their presence and actions at the residence were not unreasonable under the Fourth Amendment. *See United States v. Taylor*, 458 F.3d 1201, 1204–05 (11th Cir. 2006) (holding that officers were justified in entering property to investigate 9-1-1 calls and would be "derelict in their duty if they did anything else"); *see also Lawrence v. Gwinnett County*, 557 F. App'x 864, 871–72 (11th Cir. 2014) (finding that 9-1-1 call and reception by resident gave officer "an objectively reasonable, good-faith belief that he had consent to . . . investigate further"); *Roberts v. Spielman*, 643 F.3d 899, 905–06 (11th Cir. 2002) (rejecting argument that officer was required to desist in his duties responding to a 9-1-1 call because resident was alive and told him to "get the f*** out of here").

contravene these facts; thus, no reasonable jury could conclude that Capeletti acted unreasonably in using deadly force to end the risk that Gibbs posed to the officers. *See Plumhoff*, 134 S. Ct. at 2022; *Oakes*, 494 F. App'x at 39; *Penley*, 605 F.3d at 851; *see also Johnson v. Niehus*, 491 F. App'x 945, 946 (11th Cir. 2012) (reversing denial of summary judgment for defendants based on the "version of facts provided by the officers and confirmed by the physical evidence"). Accordingly, Capeletti's motion for summary judgment as to Count VII is due to be granted.

### B. Second Amendment Claim

Plaintiff contends that Capeletti is liable for violating Gibbs' Second Amendment rights by shooting Gibbs "because he was holding a shotgun in his home." (Doc. 85, p. 19.) The Second Amendment provides: "A well regulated Militia, being necessary to the security of a Free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. On June 13, 2011, the Second Amendment had been applicable in private actions against a state actor for only one year. *See McDonald v. City of Chicago*, 130 S. Ct. 3020, 3026 (2010) (departing from *United States v. Cruikshank*, 92 U.S. 542, 553 (1875), to hold that the Second Amendment is applicable to the States by virtue of the Fourteenth Amendment). Accordingly, there was no clearly established law concerning what actions by a state law enforcement officer would violate an individual's rights under the Second Amendment.

Notwithstanding the dearth of controlling law, Plaintiff contends that Capeletti is not entitled to qualified immunity because the "wording of the Second Amendment and the Supreme Court's decision in [*District of Columbia v. Heller*, 554 U.S. 570 (1980)] is sufficiently clear to put Capeletti on notice that shooting [Gibbs] for holding (or 'bearing') a shotgun in his home, violated his clearly established Second Amendment right."

16

(Doc. 85, p. 19.) The Court cannot agree. *Heller* struck down laws generally prohibiting the possession of handguns in the District of Columbia and requiring that lawfully owned firearms kept in homes be "unloaded and disassembled or bound by a trigger lock or similar device." *Heller*, 554 U.S. at 573, 635. Reasonable law enforcement officers would not read *Heller* as applicable to their practices in responding to domestic violence calls when a gun is in the home and is wielded by the homeowner against the officers. Indeed, the *Heller* Court noted that "[l]ike most rights, the right secured by the Second Amendment is not unlimited . . . [it is] not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626. Accordingly, Capeletti's motion for summary judgment on Count VIII is due to be granted.

## II.     The City

Plaintiff asserts two § 1983 claims against the City based on Capeletti's shooting of Gibbs. (Doc. 53.) Under *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978), "municipalities are subject to § 1983 liability 'when execution of a government's policy or custom'" causes a state actor to violate a person's constitutional rights. *See Mercado v. City of Orlando*, 407 F.3d 1152, 1161 (11th Cir. 2005). Absent a constitutional violation, Plaintiff's § 1983 claims against the City "are without merit." *Oakes*, 494 F. App'x at 41 (affirming summary judgment for municipality where "[n]o excessive force" was shown). Here, the City correctly argues that Plaintiff's claims against it fail because the evidence is that Capeletti's conduct was constitutionally reasonable. (*See supra* pp. 10–16; Doc. 78.) Further, even if Plaintiff had established a question of fact regarding the constitutional reasonableness of Capeletti's use of force, the City still would be entitled to summary judgment because no reasonable jury could

conclude that the moving force behind Capeletti's actions was a failure to train or the City's domestic violence policy. *See Eddins v. Gee,* No. 8:12-CV-1842-T-30TGW, 2013 WL 6668693, at *4–5 (M.D. Fla. Dec. 18, 2013). Accordingly, the City's motion for summary judgment on Counts IV and V of the Third Amended Complaint is due to be granted.

## III. State Law Claims

After entry of judgment for Capeletti and the City on Counts IV, V, VII and VIII, only state law claims remain. Under such circumstances, the Court may decline to exercise supplemental jurisdiction over the state law claims. *See* 28 U.S.C. § 1367(c)(3); *see also Ayton v. Orange Cnty. Sheriff Dep't*, No. 6:10-cv-1930-Orl-28GJK, 2012 WL 4711911, at *3 (M.D. Fla. Oct. 3, 2012) (declining to exercise supplemental jurisdiction over state law claims after granting summary judgment on plaintiff's federal claim). Plaintiff initially filed this action in state court. (Doc. 1.) Further, as discussed in a prior Order, Plaintiff's state law claims present difficult questions under Florida law. (Doc. 52, pp. 16–22.) For these reasons, the Court will decline to exercise supplemental jurisdiction over Plaintiff's state law claims and will remand this action to the Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida.

## CONCLUSION

Accordingly, it is hereby **ORDERED AND ADJUDGED**:

1. Defendant, City of Winter Garden's Revised Motion for Final Summary Judgment and Incorporated Memorandum of Law (Doc. 78) is **GRANTED IN PART**.

2. Summary judgment is **GRANTED** in favor of the City of Winter Garden and against Plaintiff on Plaintiff's federal claims (Counts IV and V) and is

      otherwise **DENIED**.

3. Defendant, James Edward Capeletti's Revised Motion for Final Summary Judgment and Incorporated Memorandum of Law (Doc. 79) is **GRANTED IN PART**.

4. Summary judgment is **GRANTED** in favor of James Edward Capeletti and against Plaintiff on Plaintiff's federal claims (Counts VII and VIII) and is otherwise **DENIED**.

5. Defendants, City of Winter Garden and James Edward Capeletti's Motion to Exclude Plaintiffs' Expert Witness (Doc. 70) is **DENIED AS MOOT**.

6. The Clerk is **DIRECTED** to remand this action to the Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida, for resolution of Plaintiff's remaining state law claims.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on August 18, 2014.

ROY B. DALTON JR.
United States District Judge

Copies:

Counsel of Record

Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida